By the Review Panel:
On October 12, 1972, by S. Res. 379, 92d Cong., 2d Sess., the Senate referred S. 4097, 92d Cong., 2d Sess., a bill for the relief of Dr. Donald J. Aim, to the Chief Commissioner of the Court of Claims, pursuant to sections 1492 and 2509 of Title 28, U.S.C., for further proceedings in accordance with applicable law.
The Chief Commissioner referred the case to Trial Commissioner Philip R. Miller for proceedings in accordance with the applicable rules and designated the above members of the Review Panel to consider the Trial Commissioner’s decision on the merits of plaintiff’s equitable or legal right to recover.
Based on a stipulation of the parties, Commissioner Miller, on January 22, 1974, reported his decision, concluding:
(1) that Dr. Donald J. Aim has no legal claim against the United States;
(2) that the question as to whether or not Dr. Donald J. Aim has an equitable claim has been rendered moot by settlement of the claim, in which Dr. Aim has received payment from the United States Department of Agriculture of $20,297.20 in exchange for assignment to the United States by Dr. and Mrs. Aim of all claims against Joseph Riley Diffie and waiver and release of all claims sought in this proceeding ; and
(3) that no further amount is legally or equitably due from the United States.
Since the time for filing notices of intention to except has passed, without either party filing any such notice, and upon careful consideration of Commissioner Miller’s report, the Review Panel is in unanimous agreement with Commissioner *793 Miller’s opinion, findings of fact, and conclusions as hereinafter set forth. The Review Panel, therefore, adopts the same without oral argument as the basis of its recommendation that Dr. Donald J. Aim has no legal claim against the United States, that any claim by Dr. Aim for equitable relief is rendered moot by his settlement with the Department of Agriculture, and that no further amount is legally or equitably due to Dr. Aim from the United States.
This determination is, accordingly, submitted to the Chief Commissioner for transmittal to the United States Senate.
OriNioN op the Commissioner*
Miller, Commissioner:
On October 12,1972, by S.Res. 379, 92d Cong., 2d Sess., the Senate referred bill numbered S.4097, 92d Cong., 2d Sess., to the Chief Commissioner of the Court of Claims.
The bill which is the subject of this referral is entitled “A bill for the relief of Doctor Donald J. Aim.” It proposes that the Secretary of the Treasury be authorized and directed to pay, out of funds not otherwise appropriated, to Dr. Aim of Eau Claire, Wisconsin, a sum of money yet unspecified—
in full settlement of all his claims against the United States as the result of the Farm Home Administration retaining such amount paid to it by a third party who had obtained such funds from the said Doctor Donald J. Aim, under circumstances which constituted duress.
S. Res. 379 directs that the Chief Commissioner shall proceed with the bill in accordance with the provisions of 28 U.S.C. §§ 1492 and 2509, and report thereon to the Senate, at the earliest practicable date—
giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due from the United States to the claimant.
Dr. Aim filed his petition with the Clerk of the Court of Claims on November 24, 1972, and defendant, the United *794 States, filed its answer on January 23, 1973. Thereafter the parties engaged in extensive negotiations to arrive at a stipulation of the pertinent facts and an agreement on an amicable disposition of the controversy. As a result, in lieu of trial, on December 21,1973, the parties filed a stipulation of settlement and recommended findings of fact.
The stipulation sets forth all of the pertinent facts, the substance of which is contained in the Findings of Fact made a part of this report, and the agreement of the parties as to the proper disposition of the claimant’s claim. The stipulation is accepted and approved by the trial commissioner, and this report is based on its provisions.
In accordance with such stipulated agreement of the parties, as accepted and approved by the trial commissioner, the Senate should be informed:
(a) that claimant has no legal claim against the United States;
(b) that the question as to whether or not claimant has an equitable claim has been rendered moot by a settlement of the claim, in which Dr. Aim has received payment from the United States Department of Agriculture of $20,297.20 in exchange for assignment to the United States by Dr. and Mrs. Aim of all claims against Joseph Riley Diffie and waiver and release of all claims sought in this proceeding;
(c) that no further amount is legally or equitably due from the United States.
Findings of Fact
1. Claimant is a dentist, residing in Eau Claire, Wisconsin.
2. The petition presents a claim for $20,297.26 plus various cost elements based upon the primary claim amount.
3. On October 20, 1970, the Farmers Home Administration (FHA), an agency of the United States Department of Agriculture, granted an operating loan in the amount of $22,000 to Mr. and Mrs. Joseph R. Diffie of Independence, Wisconsin. The loan was secured by a lien on certain of the borrowers’ chattels, including 165 head of 'livestock and five pieces of farm equipment.
4. By Deposit Agreement, dated November 9, 1970, Mr. and Mrs. Diffie, Warren E. Korte of the Waumandee State *795 Bank (Bank) in Wanmandee, Wisconsin, and Allen R. Whe-lan, County Supervisor, Buffalo County FHA office, Alma, Wisconsin, agreed that the FHA loan proceeds would be deposited in Diffie’s account in the bank and disbursed only with the approval of Diffie and FHA. On the same date deposit was made in the amount of $22,000 in the Diffies’ account, subject to FHA countersignature.
5. At various times between December 1970 and October 1971, various sales of livestock were approved and various purchases of farm equipment and livestock were added to the security agreement. The purchases were made with funds from the FHA supervised account. During the same period payments were made on the loan, the funds for which were derived from proceeds of the authorized sales of security property.
6. The County Supervisor, Allen R. Whelan, maintained a Running Case Record in which he logged observations and information pertaining to the loan account. The following are pertinent to the present case.
7/23/71 Farm visit. Stopped in for a visit. No one was home, everything looks O.K. Will reschedule visit.
7/28/71 Farm visit. Talked with hired man. Joe is down in Oklahoma breaking a horse. Heard from neighbor that Joe purchased another farm in Trempealeau Comity.
3/7/72 Office. County Clerk concerned about personal property taxes of Diffies’ which have not been paid yet.
3/7/72 Office. Phoned J. J. Rosenow, Treasurer of the town of Montana to find out what taxes Diffie owed. Diffie lives in Whitehall, where his wife teaches school and he drives to the farm every day to do chores.
3/9/72 Office. J. J. Rosenow, Town of Montana Treasurer, in office and wants to know how he can get money for personal property taxes. He claimed Diffie has sold all of his cattle and hogs.
3/9/72 Office. Phoned Herman Pape residence in Independence. Their farm adjoins the Diffie’s farm. (Diffie’s farm is also owned by Pape.)
3/9/72 3:30 p.m. Went to Waumandee Bank. Warren Korte said he had loaned Diffie $1,000 on a note. Did not have a second chattel mortgage.
*796 3/9/72 Visit to the Diffie farm. Walked into the farm. There were two horses, one pony, and a pig running around ih the front yard. Some machinery, haybine, elevator, spreader, and flat bed wagon, not much else. In the barn were farrowing crates, feeders, good hay (about 3,000 bales). That is all that is on the farm.
3/9/72 6:00 p.m. Visit to Diffie’s house. Called with Fred Gilhnore, County Supervisor, Trempealeau County. Mrs. Diffie stated that Mr. Diffie was in Eau Claire and that she did not know when he would be home. Also she did not know where he was. Stated that they were having marital difficulty and that he did not always come home. County Supervisor told Mrs. Diffie that we wanted to get in touch with Mr. Diffie right away to discuss this matter. Mrs.
Diffie said that she would try to get word to Mr. Diffie.
3/9/72 7:30 p.m. Visit to Herman Pape house in Independence. Pape was sure that all the cattle and hogs were sold. He thought that the cattle were sold in the last part of September. Also said that he wondered why the cattle were sold so early because there was a lot of pasture left. Mr. and Mrs. Diffie moved from Mr. Pape’s farm on November 20, 1971. Mr. Pape fed the hogs until all the com was gone. Mr. Pape said that a Paul E. Mathews lives in the house on his farm that Diffie used to live in. A blue 1966 Chev. license plate X86-678 was in front of Diffie’s house and belonged to Mathews.
3/9/72 9:30 p.m. Stop at farm of Palmer Solfest. Cattle were sold Sunday August 15, 1971. Loaded in front of Solfest’s farm just off 121 N. of Eussell in Township of Chimney Eock, Trempealeau County. Mr. Solfest thinks that the semi’s that loaded the cattle were from Arcadia. Cattle had been driven by foot over the Montana Eidge down Cook Valley then down 121 to Eussell about the last week of April. Diffie has Carl Eeinhold’s farm leased in Chimney Eock. Farm is all pasture and 280A. Mr. Eein-hold lives at 502 East Eve St., Phoenix, Arizona.
7. On March 8,1972, at approximately 10:30 p.m., Steven John Aim, claimant’s minor child, was kidnapped from his home.
*797 8. At 10:45 p.m., ransom demand in the amount of $50,000 was made upon claimant for the safe return of his son. The kidnappers specified that the ransom be paid in cash of small denominations.
9. On March 9, 1972, claimant negotiated a loan with the American National Bank and Trust Company, Eau Claire, Wisconsin, in the amount of $50,000, the proceeds of which were paid to claimant in denominations of $5, $10, and $20 bills. Before the bills were delivered over to claimant, they were microfilmed and the microfilm was sent to the National Crime Information Center in Washington, D.C.
10. That same day claimant delivered the cash to the kidnappers as directed.
11. By this time, the Federal Bureau of Investigation had been called in on the kidnapping case.
12. The Federal Bureau of Investigation, as a matter of policy, does not advise or participate in any decision on whether or not to pay a ransom and leaves any such decision to the individual upon whom the demand is made. The Bureau followed this policy in this case.
13. Steven John Aim was returned to his family unharmed.
14. The Running Case Record kept by Mr. Whelan contained the following account of the occurrences of March 10, 1972.
3/10/72 Office. Mr. Diffie phoned saying that he would be coming in to pay off for the loan. Said that he was phoning from LaCrosse. Would be in about 11:00. Then phoned at 11:00 from Arcadia that he would be in about noon.
Came in the office about noon. Talked a while and then the County Supervisor requested that he pay the loan in full since he had sold all the livestock. Mr. Diffie went out to his truck to get the money. When Diffie came in, Assistant County Supervisor Duane Wilman phoned the Sheriff’s Office and requested a Deputy to guard the office.
Mr. Diffie paid off in two bundles of $20 of $5,000 each, two bundles of $10 of $5,000 each, plus $297.20. (Auditor noted from loan file that repayment of the loan was computed as follows: Outstanding loan principal $20,300; Interest on loan to March 10,1972, $1,081.82; less the remain *798 ing balance of the loan in the Supervised Account of $1,084.62; leaving an amount due on the loan of $20,297.20.)
He had over $25,000 in cash in his suitcase. After counting the money, which took about 12:00 to 1:30 P.M. County Supervisor and Mrs. Lois B. Scharr, FHA Chief Clerk, took the money to the American Bank to be counted again by Dan Schilling. Schilling obtained a postal money order in the amount of $20,297.20. County Supervisor went with Diffie to the Alma Hotel and ate dinner with him. Came back to office and Mrs. Scharr had returned with postal check in amount of $20,297.20.
Seems funny at this time to get so much money in $10 and $20 bills. Diffie claimed that he had made the money in cattle futures. Also admitted that he had sold all the cattle for $55,000 and paid off other loans with his father and uncle and used FHA money to play the livestock market in cattle futures. Diffie was cool and collected and gave a convincing story, but the County Supervisor felt that under the circumstances he should take the money.
15. J. R. Diffie was not developed as a suspect in the kidnapping until March 11, 1972, when the FBI learned that Diffie had been to Dr. Aim’s office a few days before the kidnapping. On March 11, 1972, Mr. Whelan was informed by the FBI that the cash received and accepted as repayment of the loan may have been ransom money obtained in the kidnapping. Until that time, neither Whelan nor any of the Farmers Home Administration staff suspected the true source of the cash used to repay Diffie’s loan.
16. The first jiress release concerning the Iddnapping was made at noon, March 11,1972. It made no mention of Diffie or any other suspect.
17. The serial numbers of the bills, entered into the computer at the National Crime Information Center, were not publicized or circulated locally in Wisconsin.
18. Of the cash used to repay the FHA loan, all but three $20 bills and one $10 bill were identified with the known serial numbers of the ransom bills.
19. Diffie was arrested on March 12, 1972. He, Paul Mathews and Mary Mathews were subsequently charged with *799 kidnapping by Wisconsin authorities; all three pleaded guilty and have been sentenced.
20. Claimant’s attorney, Duane Herrick, began attachment proceedings on March 14,1972, to get Diffie’s property.
21. Diffie was involved in commodities speculation and maintained an account with the Piper, Jaffrey and Hopwood brokerage firm in Eau Claire, Wisconsin, from August 24, 1971 until the account was closed March 20, 1972, with a closing balance of $935. Another account, with Bache and Company, Minneapolis, Minnesota, existed from February 17,1971 until March 30,1972. The closing balance of this account was $256.20.
22. None of the money in the two commodities accounts was reached by any attachment process in behalf of Dr. Aim.
23. Claimant had continued to make regular payments on his loan with American National Bank and Trust Company.
24. On October 12, 1972, United States Senate bill No. S. 4097, entitled “A bill for the relief of Doctor Donald J. Aim” was referred to the Chief Commissioner of the United States Court of Claims by Senate Resolution No. S. Res. 379.
25(a). The parties have agreed that claimant has no legal claim against the United States.
(b). The parties have agreed that question whether plaintiff has an equitable claim has been rendered moot and settled as follows:
(1). The Department of Agriculture has paid to Dr. Aim the sum of $20,297.20.
(2). Dr. and Mrs. Aim have assigned any claims they have against Joseph Riley Diffie to the United States to the extent of the first $20,297.20 recoverable from Joseph Riley Diffie.
(3). Dr. and Mrs. Aim have waived and released any claim to interest, costs or other relief against the United States sought in this action.
(4). Joseph Riley Diffie has renewed his obligation to the United States Department of Agriculture, Farmers Home Administration, with no strings attached regarding his prospects, if any, for parole, pardon, work release or any other consideration regarding the term or conditions of his imprisonment.
*800 (5). All.parties recommend and move that the Chief Commissioner report to the Congress that the administrative resolution and settlement fully satisfies Dr. Aim’s claim against the United States and the Congressional Eeference should be dismissed with prejudice in all respects.
CONCLUSIONS
1. The claimant, Dr. Donald J. Aim, does not have a legal claim against the United States.
2. The claimant does not presently have a valid equitable claim against the United States, because his asserted claim has been rendered moot by his acceptance of an amount paid by the United States in satisfaction thereof and by his waiver and release of all claims sought in this proceeding.
3. No further amount is presently due from the United States to the claimant.

The opinion, findings of fact and conclusions are submitted under the order of reference and the Rules of the Chief Commissioner.